FILED BY _____ D.C.

SEP 2 6 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

.UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **19 - 60273** CR-UNGARO

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(B)
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

JAMES L. SIMMONS
a/k/a "JAMIE SIMMONS,"

                    Defendant.
_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

### MEDICARE PROGRAM

1.     The Medicare Program ("Medicare") was a federally funded program that provided

free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and

disabled.  The benefits available under Medicare were governed by federal statutes and regulations.

The United States Department of Health and Human Services ("HHS"), through its agency, the

Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

Individuals who received benefits under Medicare were commonly referred to as Medicare

"beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States

Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies.  Part B of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," is described in further detail below.

4.      Physicians, clinics and other health care providers, including laboratories, which provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5.      A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## PART B COVERAGE AND REGULATIONS

6.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.      Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.  Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.  First Coast Service Options, Inc. ("First Coast") was the (MAC) for the consolidated Medicare jurisdiction that covered Florida, Puerto Rico and the U.S. Virgin Islands.

8.      To receive Medicare reimbursement, providers had to make appropriate application to the MAC and executed a written provider agreement.  The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

9.      CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare

and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10.     Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary.  For this to occur, the beneficiary would assign the right of payment to the health care provider.  Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### THE MEDICARE ADVANTAGE PROGRAM

11.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

12.     Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Parts A and B of Medicare.  To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Part A and Part B of the Medicare Program.

13.     A number of companies, including UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare") and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various plans.

14.     UnitedHealth, Humana, WellCare and CVS Health were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

4

15.     These companies, through their respective Medicare Advantage programs, often made payments directly to physicians, medical clinics, or other health care providers, rather than to the Medicare Advantage beneficiary that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

16.     To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage plan, physicians, medical clinics, and other health care providers had to submit itemized claim forms to the beneficiary's Medicare Advantage plan.  The claim forms were typically submitted electronically via the internet.  The claim form required certain important information, including the information described above in paragraph 5 of this Indictment.

17.     When a provider submitted a claim form to a Medicare Advantage program, the provider party certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The submitting party also certified that the services being billed were medically necessary and were in fact provided as billed.

18.     The private health insurance companies offering Medicare Advantage plans were paid a fixed rate per beneficiary per month by the Medicare program, regardless of the actual number or type of services the beneficiary receives.  These payments by Medicare to the insurance companies were known as "capitation" payments.  Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage plan, regardless of whether or not the beneficiary utilized the plan's services that month.  CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence.

CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments.  Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

## CANCER GENOMIC TESTS

19.     Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.

20.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."  Title 42, Code of Federal Regulations, Section 411.15(a)(1).  Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests."  *Id.*

21.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."  *Id.*

22.     Cancer genomic ("CGx") tests were a type of testing that used DNA sequencing to detect mutations in genes related to cancer.  CGx tests did not identify whether a beneficiary had cancer.  Rather, CGx tests could identify whether a beneficiary had certain genetic mutations that might put them at increased risk of developing cancer in the future.  If a beneficiary had been diagnosed with cancer, CGx tests could also provide information to the beneficiary's treating physician about the type of cancer the beneficiary had, as well as what treatment options might be available to treat that cancer.

23.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.  Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## TELEMEDICINE

24.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

25.     Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers.  Telemedicine companies typically paid doctors a fee to conduct consultations with patients.   In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

26.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met.  These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was a practitioner's office or a specified

medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

### THE DEFENDANT, RELATED ENTITIES, AND OTHER INDIVIDUALS

27.     MedSymphony, LLC ("MedSymphony"), a corporation organized under the laws of the State of Florida, with its principal place of business at 1520 East Sunrise Blvd., Suite 201 and 203, Ft. Lauderdale, Florida, was a telemedicine company that purported to provide telemedicine services, including, among other things, the authorization of CGx tests for Medicare beneficiaries.

28.     Meetmydoc, LLC ("Meetmydoc"), a corporation organized under the laws of the State of South Carolina, with its principal place of business at 53 North Valigogue Cay Rd., Hilton Head, South Carolina, was a telemedicine company that purported to provide telemedicine services, including, among other things, the authorization of CGx tests for Medicare beneficiaries.

29.     Defendant **JAMES L. SIMMONS** (a/k/a and hereinafter **"JAMIE SIMMONS"**,) a resident of South Carolina, was the owner of MedSymphony and Meetmydoc

30.     Company 1, a corporation organized under the laws of the State of Florida, with its principal place of business in Broward County, Florida, was a marketing company that purported to market CGx tests.

31.     Individual 1, a resident of Broward County, Florida, was an owner of Company 1.

32.     Individual 2, a resident of Broward County, Florida, was an owner of Company 1.

33.     Company 2, a corporation organized under the laws of the State of Florida, with its principal place of business in Broward County, Florida, was a marketing company that purported to market CGx tests.

34.     Individual 3, a resident of Broward County, Florida, was an owner of Company 2.

35.     Individual 4, a resident of Broward County, Florida, was an employee of Company 2.

36.     Laboratory A was a laboratory located in the State of Pennsylvania that, among other things, conducted CGx testing.

37.     Laboratory B was a laboratory located in the State of Pennsylvania that, among other things, conducted CGx testing.

38.     Laboratory C was a laboratory located in the State of Texas that, among other things, conducted CGx testing.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2018, through in or around September 2019, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**JAMIE SIMMONS,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Individuals 1-4, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and

9

payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.        to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.        It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that Laboratory A, B, and C, could bill Medicare for CGx Tests, without regard to whether the beneficiaries needed the test; (b) paying kickbacks to MedSymphony and Meetmydoc in exchange for ordering and arranging for the ordering of CGx tests for Medicare beneficiaries, without regard to whether the CGx tests were medically necessary or eligible for Medicare reimbursement, and without regard for the fact that the tests were prescribed without any physician-patient relationship; (c) submitting and causing the submission via interstate wire communication of false and fraudulent claims to Medicare and Medicare Advantage plans, through Laboratory A, B, and C, for CGx tests that were not medically necessary and not eligible for Medicare reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

10

## MANNER AND MEANS

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.   **JAMIE SIMMONS**, through MedSymphony, supplied fraudulent orders for CGx tests and other Medicare-required documents (collectively referred to as "Doctors' Orders") for CGx tests to Individuals 1-4, and others, that would be used to support claims made via interstate wire communications for CGX Tests to Medicare and Medicare Advantage plans, made by Laboratory A, B, and C, for Medicare beneficiaries referred by Company 1 and Company 2.

5.   **JAMIE SIMMONS,** through MedSymphony, supplied these fraudulent Doctors' Orders written by doctors contracted with MedSymphony, even though those doctors were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, had no physician-patient relationship or, at times, any contact with the beneficiaries, and did not conduct a proper telemedicine visit, and often never contacted the beneficiaries.

6.   **JAMIE SIMMONS**, through Meetmydoc, received kickbacks and bribes from Individuals 1-4, and others, in exchange for fraudulent Doctors' Orders for CGx tests for Medicare beneficiaries that were used to support fraudulent CGx test claims made via interstate wire communications to Medicare and Medicare Advantage plans for those tests from Laboratory A, B, and C.

7.   Laboratory A, B, and C, in turn, paid kickbacks and bribes to Individuals 1-4, and others, for referring Medicare beneficiaries for these CGx tests.

8.   **JAMIE SIMMONS**, Individuals 1-4, and others, created sham contracts and documentation that disguised the kickbacks and bribes as payments from Company 1 and

Company 2 for telemedicine services.  The payments were made to Meetmydoc to conceal the true nature of the payments, and to conceal that Laboratory A, B, and C, were paying money to Company 1 and 2 for marketing services, and that Company 1 and Company 2 used part of these kickbacks to pay MedSymphony and Meetmydoc, for Doctor's Orders.

9.        **JAMIE SIMMONS**, Individuals 1-4, and others, obtained access to thousands of Medicare beneficiaries by targeting them with telemarketing campaigns, social media advertising, and health fairs, and inducing them to accept CGx tests regardless of medical necessity.

10.        **JAMIE SIMMONS**, Individuals 1-4, and others, communicated patients' information, invoices and statements, CGx testing approvals and procedures, requisition forms and Doctors' Orders, and other writings related to the scheme via e-mails, text messages, and internet based document sharing systems (such as "Drop Boxes" and "Portals")

11.        **JAMIE SIMMONS,** Individuals 1-4, and other co-conspirators, caused Laboratory A, Laboratory B, and Laboratory C, to submit false and fraudulent claims to Medicare and Medicare Advantage plans for fraudulent CGx tests authorized by MedSymphony doctors, in at least the approximate amount of $56,342,796, via interstate wire communications.

12.        As the result of these false and fraudulent claims, Medicare and Medicare Advantage plans made payments to Laboratory A, Laboratory B, and Laboratory C, for fraudulent CGx tests authorized by MedSymphony doctors, in at least the approximate amount of $17,869,208, via interstate wire communications.

13.        **JAMIE SIMMONS,** Individual 1, Individual 2, Individual 3, Individual 4, and other co-conspirators used the fraud proceeds to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-16
## Health Care Fraud
## (18 U.S.C. § 1347)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around January 2018, through in or around September 2019, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

## JAMIE SIMMONS,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare and Medicare Advantage plans, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit programs.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that Laboratory A, B, and C, could bill Medicare for CGx Tests, without regard to whether the beneficiaries needed the test; (b) paying kickbacks to MedSymphony and Meetmydoc in exchange for ordering and arranging for the ordering of CGx tests for Medicare beneficiaries, without regard to whether the tests were medically necessary or eligible for Medicare reimbursement, and without regard for the fact that the tests were prescribed without any physician-patient relationship; (c) submitting and causing

the submission via interstate wire communication of false and fraudulent claims to Medicare and Medicare Advantage plans, through Laboratory A, B, and C, for CGx tests that were not medically necessary and not eligible for Medicare reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

## THE SCHEME AND ARTIFICE

4.     The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## ACTS IN EXECUTION OR ATTEMPTED EXECUTION OF THE SCHEME AND ARTIFICE

5.     On or about the dates set forth as to each count below, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

## JAMIE SIMMONS,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in that the defendant submitted and caused the submission of false and fraudulent claims, which sought the identified dollar amounts, representing that such services were medically necessary, eligible for Medicare reimbursement, and provided to Medicare beneficiaries as claimed:

| Count | Medicare Beneficiary | Approx. Claim Date | Claim No. | First Line of CGx Tests Claimed, HSPCS Code & Billing Laboratory | Approx. Total Billed |
|---|---|---|---|---|---|
| 2 | N.S. | 8/11/2018 | 78350220337 | **Gene Analysis** (adenomatous polyposis coli, full gene sequence) **81201**. **Laboratory A** | $4,656 |
| 3 | N.S. | 8/11/2018 | 78350220338 | **Gene Analysis** (mutS homolog 6 [E coli], full sequence analysis) **81298**. **Laboratory A** | $8,797 |
| 4 | M.J. | 10/28/2018 | 84127955626 | **Gene Analysis** (adenomatous polyposis coli full gene sequence) **81201**. **Laboratory C** | $858 |
| 5 | M.J. | 10/28/2018 | 84127955627 | **Gene Analysis** (breast cancer 1 and 2) full sequence and common duplication or deletion variants) **81211**. **Laboratory C** | $11,900 |
| 6 | R.S. | 11/13/2018 | 80702000523 | **Gene Analysis** (adenomatous polyposis coli, full gene sequence) **81201**. **Laboratory C** | $4,236 |
| 7 | R.S. | 11/13/2018 | 0702000525 | **Gene Analysis** (mutS homolog 2, colon cancer, nonpolyposis type 1, full sequence analysis) **81292**. **Laboratory C** | $9,144 |
| 8 | R.S. | 11/14/2018 | 81749107043 | **Gene Analysis** (cytochrome P450, family 2, subfamily C, polypeptide 19 common variants) **81255**. **Laboratory C** | $1,897 |
| 9 | A.H. | 1/14/2019 | 82471391716 | **Gene Analysis** (breast cancer 1 and 2, full sequence and analysis for duplication or deletion variants) **81162**. **Laboratory C** | $2,478 |
| 10 | A.H. | 1/14/2019 | 83065722754 | **Gene Analysis** (adenomatous polyposis coli, full gene sequence) **81201**. **Laboratory C** | $10,123 |

15

| Count | Medicare Beneficiary | Approx. Claim Date | Claim No. | First Line of CGx Tests Claimed, HSPCS Code & Billing Laboratory | Approx. Total Billed |
|---|---|---|---|---|---|
| 11 | A.H. | 1/14/2019 | 85251541802 | **Gene Analysis**<br>(cytochrome P450, family 2, subfamily C, polypeptide 19 common variants)<br>**81255**.<br>**Laboratory C** | $1,897 |
| 12 | I.T. | 02/10/2019 | 84657516923 | **Gene Analysis**<br>(adenomatous polyposis coli, full gene sequence)<br>**81201**.<br>**Laboratory C** | $858 |
| 13 | I.T. | 02/10/2019 | 84657516924 | **Gene Analysis**<br>(breast cancer 1 and 2, full sequence and analysis for duplication or deletion variants)<br>**81162**.<br>**Laboratory C** | $11,743 |
| 14 | I.T. | 02/11/2019 | 83589162199 | **Gene Analysis**<br>(cytochrome P450, family 2, subfamily C, polypeptide 19, common variants)<br>**81255**.<br>**Laboratory C** | $1897 |
| 15 | I.T. | 02/11/2019 | 84125510512 | **Gene Analysis**<br>(cytochrome P450, family 2, subfamily C, polypeptide 19, common variants)<br>**81225**.<br>**Laboratory C** | $1,897 |
| 16 | J.S. | 04/15/2019 | 84516143973 | **Gene Analysis**<br>(mutL homolog 1, colon cancer, nonpolyposis type 2, duplication or deletion variants)<br>**81294**.<br>**Laboratory A** | $1,463 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 17
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1.     Paragraphs 1 through 38 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around January 2018, through in or around September 2019, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**JAMIE SIMMONS,**

did willfully, that is with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Individual 1, Individual 2, Individual 3, Individual 4, and others, known and unknown to the Grand Jury:

a.     to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program, in violation of Title 18, United States Code, Section 371, and to commit certain offenses against the United States, that is:

b.     to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, this is, Medicare and Medicare Advantage plans.

## PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by: (a) soliciting, receiving, offering and paying kickbacks and bribes to obtain Doctors' Orders for CGx tests for Medicare beneficiaries; and (b) submitting and causing the submission of claims to Medicare and Medicare Advantage plans for CGx tests that Laboratory A, Laboratory B, and Laboratory C purported to provide to those Medicare beneficiaries; (c) concealing the submission of kickbacks and bribes; and (d) diverting proceeds for their personal use and benefit, the use and benefit of others and to further the conspiracy.

## MANNER AND MEANS

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.      Co-conspirators, including Individuals 1-4, and others, offered and paid kickbacks to **JAMIE SIMMONS**, through Meetmydoc and MedSymphony, in exchange for the ordering and arranging for ordering CGx tests for Medicare beneficiaries.

5.      **JAMIE SIMMONS,** Individuals 1-4, and other co-conspirators, caused Laboratory A, Laboratory B, and Laboratory C to submit false and fraudulent claims to Medicare and Medicare Advantage plans.

6.      As the result of these claims, Medicare and Medicare Advantage plans, made payments to Laboratory A, Laboratory B, and Laboratory C.

7.      **JAMIE SIMMONS,** Individuals 1-4, and other co-conspirators used the proceeds received from Laboratory A, Laboratory B, and Laboratory C to benefit themselves and others, and to further the conspiracy.

18

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1.      On or about September 17, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $8,100.

2.      On or about September 17, 2018, **JAMIE SIMMONS** transferred approximately $3,960 from the Meetmydoc Wells Fargo account ending 9416, to a MedSymphony account at Wells Fargo that he controlled, ending 2733.

3.      On or about October 17, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $7,000.

4.      On or about October 23, 2018, Individuals 2 and 3 made a wire transfer from Company 2's account ending 7980 at Wells Fargo to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $4,000.

5.      On or about October 26, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $10,000.

6.      On or about October 29, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $5,000.

7.      On or about October 30, 2018, Individuals 2 and 3 made a wire transfer from

Company 2's account ending 7980 at Wells Fargo to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $7,000.

8.      On or about November 1, 2018, **JAMIE SIMMONS** transferred approximately $51,620 from the Meetmydoc account at Wells Fargo that he controlled ending 9416, to a MedSymphony account at Wells Fargo that he controlled, ending 2733.

9.      On or about November 5, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $15,000.

10.     On or about November 6, 2018, Individuals 2 and 3 made a wire transfer from Company 2's account ending 7980 at Wells Fargo to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $7,000.

11.     On or about November 14, 2018, Individuals 2 and 3 made a wire transfer from Company 2's account ending 7980 at Wells Fargo to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $3,800.

12.     On or about November 16, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $18,200.

13.     On or about November 16, 2018, **JAMIE SIMMONS** transferred approximately $64,440 from the Meetmydoc account at Wells Fargo that he controlled ending 9416, to a MedSymphony account at Wells Fargo that he controlled, ending 2733.

14.     On or about December 7, 2018, Individual 1 made a wire transfer from Company 1's account ending 9977 at BB&T to Meetmydoc's account, a Wells Fargo Account ending 9416, controlled by **JAMIE SIMMONS**, for approximately $30,000.

15.     On or about December 7, 2018, **JAMIE SIMMONS** transferred approximately $12,000 from the Meetmydoc account at Wells Fargo that he controlled ending 9416, to a MedSymphony account at Wells Fargo that he controlled, ending 2733.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 18-24
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(B))

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates set forth below as to each count, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**JAMIE SIMMONS,**

did knowingly and willfully solicit and receive any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, as set forth below, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, this is, Medicare and Medicare Advantage plans:

| Count | Approx. Date of Kickback | Payor | Approx. Amt. of Kickback Received |
|-------|--------------------------|-------|-----------------------------------|
| 18 | 9/17/2018 | Company 1 | $8,100 |
| 19 | 10/17/2018 | Company 1 | $7,000 |
| 20 | 11/05/2018 | Company 1 | $15,000 |
| 21 | 11/06/2018 | Company 2 | $7,000 |
| 22 | 11/14/2018 | Company 2 | $3,800 |

| Count | Approx. Date of Kickback Payment | Payor | Approx. Amt. of Kickback Payment Received |
|-------|----------------------------------|-------|-------------------------------------------|
| 23 | 12/07/2018 | Company 1 | $30,000 |
| 24 | 12/31/2018 | Company 1 | $10,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Title 18, United States Code, Section 2.

**FORFEITURE**
**(18 U.S.C. § 982(a)(7))**

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **JAMIE SIMMONS,** has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 1347 or 1349, or a violation of, or criminal conspiracy to commit a violation of, Title 42, United States Code, Section 1320a-7b, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

(i)     The sum of at least $56,342,796 in U.S. currency, which amount is equal to the gross proceeds traceable to the commission of the violations alleged in this Indictment and which the United States may seek as a forfeiture money judgment;

(ii)    Up to and including $26,428 in U.S. currency on deposit in account number

2566769416 held in the name of Meetmydoc, LLC at Wells Fargo Bank;

   (iii)  Up to and including $47,688 in U.S. currency on deposit in account number 7795122733 held in the name of Medsymphony, LLC at Wells Fargo Bank; and

   (iv)  Up to and including $4,018 in U.S. currency on deposit in account number 2170701987 held in the names of James L. Simmons and Elizabeth V. Simmons at Bank of the Ozark.

4.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), and such property includes, but is not limited to, the real property at 53 North Calibogue Cay Road, Hilton Head, SC  29928.

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

GRAND JURY FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

ALLAN MEDINA
ACTING DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMES V. HAYES
TIMOTHY LOPER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

v.

JAMES L. SIMMONS,
a/k/a "Jamie Simmons,"

_____Defendant._____ /

CASE NO._____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

| | | |
|---|---|---|
| New defendant(s) | Yes ____ | No ____ |
| Number of new defendants | ____ | |
| Total number of counts | ____ | |

**Court Division**: (Select One)

| | | |
|---|---|---|
| __ Miami | __ Key West | |
| ✓ FTL | __ WPB | __ FTP |

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:     (Yes or No)     No
   List language and/or dialect     _____

4. This case will take __10__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   | | | | | | |
   |---|---|---|---|---|---|
   | I | 0 to 5 days | _____ | Petty | | _____ |
   | II | 6 to 10 days | ✓ | Minor | | _____ |
   | III | 11 to 20 days | _____ | Misdem. | | _____ |
   | IV | 21 to 60 days | _____ | Felony | | ✓ |
   | V | 61 days and over | _____ | | | |

6. Has this case previously been filed in this District Court?     (Yes or No)     No
   If yes: Judge _____     Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?     (Yes or No)     No
   If yes: Magistrate Case No.     _____
   Related miscellaneous numbers:     _____
   Defendant(s) in federal custody as of     _____
   Defendant(s) in state custody as of     _____
   Rule 20 from the District of     _____

   Is this a potential death penalty case? (Yes or No)     No

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?     Yes ____     No ✓

8. Does this case originate from a matter pending in the Northern Region U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?     Yes ____     No ✓

_James V Hayes_
JAMES V. HAYES
DOJ TRIAL ATTORNEY
Court ID No.:  A5501717

*Penalty Sheet(s) attached

REV 8/13/2018

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**:  **JAMES L. SIMMONS**

**Case No**: _____

Count #: 1

Conspiracy to Commit Health Care and Wire Fraud

Title 18, United States Code, Section 1349

**\* Max. Penalty**:      Twenty (20) years' imprisonment

Counts #: 2-16

Health Care Fraud

Title 18, United States Code, Section 1347

**\* Max. Penalty**:      Twenty (10) years' imprisonment as to each count

Count #: 17

Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty**:      Five (5) years' imprisonment

Counts #: 18-24

Receipt of Kickbacks in Connection with a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(B)

**\* Max. Penalty**:      Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**